UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATHANIEL LEE, JR.,

        Petitioner,

                                        CASE NO. 2:07-CV-15060
    v.                                  JUDGE STEPHEN J. MURPHY, III
                                        MAGISTRATE JUDGE PAUL J. KOMIVES

JEFF WHITE,

        Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
        A.   *Procedural History*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
        B.   *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        C.   *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
        D.   *Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
             1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
             2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
        E.   *Confrontation (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
        F.   *Sentencing (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
             1.   *Failure to Consider Sentencing Factors/Presentence Report or Individualize Sentence*  21
             2.   *Proportionality* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
        G.   *Prosecutorial Misconduct (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
             1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
             2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
        H.   *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
             1.   *Legal Standard*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
             2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31
        I.   *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32
III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

_____

    [1]By Order entered November 23, 2009, Jeff White has been substituted in place of Jan Trombley as the proper respondent in this action.

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Nathaniel Lee, Jr., is a state prisoner, currently confined at the Mound Correctional Facility in Detroit, Michigan.

2.      Petitioner was charged in the Oakland County Circuit Court with conspiracy to possess with intent to deliver 650 grams or more of a controlled substance, MICH. COMP. LAWS §§ 333.7401(2)(a)(I), 750.157a.  The conspiracy was alleged to span from January 1985 through September 1998.  Prior to trial, petitioner filed a motion in *limine* seeking to exclude evidence arising from a 1994 raid on a home in Pontiac.  Petitioner had been charged in connection with that raid, but was ultimately acquitted.  In his motion in *limine*, petitioner argued that the Double Jeopardy Clause barred this evidence.  The trial court agreed and granted petitioner's motion.  The prosecutor filed an interlocutory appeal in the Michigan Court of Appeals.  The court of appeals reversed, concluding that evidence of the 1994 raid was admissible.  *See People v. Lee*, No. 232011, 2001 WL 824463 (Mich. Ct. App. July 20, 2001) ("*Lee I*").  The Michigan Supreme Court denied petitioner's application for leave to appeal.  *See People v. Lee*. 465 Mich. 896, 635 N.W.2d 320 (2001).

3.      On October 18, 2002, petitioner was convicted as charged following a lengthy jury trial in the Oakland County Circuit Court.  On November 25, 2002, he was sentenced to a term of 30-60 years' imprisonment.

4.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through

counsel, the following claims:

    I.    THE PROSECUTOR FAILED TO PROVIDE SUFFICIENT EVIDENCE TO SUSTAIN A JURY VERDICT OF GUILTY OF CONSPIRACY TO POSSESS WITH INTENT TO DELIVER MORE THAN 650 GRAMS OF COCAINE, AND THE VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE PRODUCED AT TRIAL.

    II.    DEFENDANT WAS DENIED HIS RIGHT OF CONFRONTATION AS GUARANTEED BY THE CONSTITUTIONS OF THE UNITED STATES AND OF MICHIGAN WHEN THE TRIAL COURT ERRONEOUSLY PERMITTED THE PRELIMINARY EXAMINATION AND GRAND JURY TRANSCRIPT OF ERIC LEE TO BE READ TO THE JURY AFTER THE WITNESS WAS DEEMED UNAVAILABLE.

    III.    DEFENDANT'S CONVICTION OF CONSPIRACY TO DELIVER OVER 650 GRAMS OF COCAINE IS INVALID WHERE THE TRIAL COURT FAILED TO PROPERLY INSTRUCT THE JURY REGARDING THE ESSENTIAL ELEMENTS OF SPECIFIC INTENT.

    IV.    DEFENDANT'S SENTENCING PROCEEDING WAS TAINTED BY REVERSIBLE ERROR WHERE THE TRIAL COURT:

        A.    FAILED TO PROPERLY CONSIDER THE ESTABLISHED SENTENCING FACTORS AND FAILED TO ARTICULATE VALID REASONS FOR IMPOSING A 30-60 YEAR SENTENCE ON DEFENDANT FOR HIS CONVICTION OF CONSPIRACY TO POSSESS WITH INTENT TO DELIVER OF COCAINE OVER 650 GRAMS;

        B.    FAILED TO PROPERLY CONSIDER THE PSIR, ENGAGE IN THE SOUND EXERCISE OF JUDICIAL DISCRETION, AND INDIVIDUALIZE DEFENDANT'S SENTENCE, IN IMPOSING [AN] ENHANCED 30-60 YEAR SENTENCE ON DEFENDANT FOR HIS CONVICTION OF CONSPIRACY TO POSSESS WITH INTENT TO DELIVER OF COCAINE OVER 650 GRAMS;

        C.    VIOLATED THE CONCEPT OF PROPORTIONALITY IN A 30-60 YEAR SENTENCE ON DEFENDANT FOR HIS CONVICTION OF CONSPIRACY TO POSSESS WITH INTENT TO DELIVER OF COCAINE OVER 650 GRAMS.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

3

*See People v. Lee*, No. 245455, 2004 WL 2877319 (Mich. Ct. App. Dec. 14, 2004) (per curiam)

("*Lee II*").

5.    Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan

Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard

order.  *See People v. Lee*, 474 Mich. 868, 703 N.W.2d 812 (2005).

6.    On June 9, 2006, petitioner filed a motion for relief from judgment in the trial court

pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.    DEFENDANT WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS
AND A FAIR TRIAL UNDER THE FIFTH AMENDMENT TO THE
UNITED STATES CONSTITUTION WHEN THE PROSECUTION WAS
ALLOWED TO USE AN OFFENSE WHERE DEFENDANT [HAD] BEEN
ACQUITTED AS EVIDENCE TO PROVE A SUBSEQUENTIAL
CHARGE THEREBY VIOLATING THE PRINCIPLES OF DOUBLE
JEOPARDY AND COLLATERAL ESTOPPEL.

II.   DEFENDANT WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS
AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH
AMENDMENTS TO THE U.S CONST. AND UNDER CONST. 1963 ART
1, SECT 20 WHEN DEFENDANT WAS DENIED HIS RIGHT TO AN
IMPARTIAL JURY DRAWN FROM A FAIR CROSS SECTION OF THE
COMMUNITY.

III.  DEFENDANT WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS
AND A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT TO
THE U.S. CONST AND CONST 1963, ART 1, SEC 17 WHEN THE
PROSECUTOR DURING HER CLOSING ARGUMENT ENGAGED IN
PROSECUTORIAL MISCONDUCT WHEN SHE TOLD THE JURY THAT
"DEFENDANT COULD COMMIT A CONSPIRACY WITH A PERSON
EVEN IF HE DID NOT KNOW THAT PERSON, NEVER SPOKE WITH
THAT PERSON, OR DID NOT KNOW THAT PERSON WAS ALIVE"
THEREBY SHIFTING THE BURDEN OF PROOF ONTO THE
DEFENDANT TO PROVE THAT HE DID NOT COMMIT THE CRIME
OF CONSPIRACY.

IV.   DEFENDANT WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE
ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT TO
THE U.S. CONST WHEN COUNSEL FAILED TO RECOGNIZE THAT

4

THE PROSECUTOR'S CLOSING STATEMENT UNDERCUT THE ENTIRE ADVERSARY PROCESS OF THE PROCEEDING WHEN THE PROSECUTOR STATED THAT DEFENDANT COMMITTED THE CRIME WITHOUT KNOWING HIS CONFEDERATES AND NOT KNOWING IF HIS CONFEDERATES WERE EVEN ALIVE, AND WHERE COUNSEL FAILED TO RECOGNIZE THE CONTROLLING LAW WHICH WOULD HAVE SUPPORTED HIS CHALLENGE TO THE JURY SELECTION PROCESS.

V.     DEFENDANT IS ENTITLED TO POST-CONVICTION RELIEF PURSUANT TO 6.508(D) AND CAN SHOW CAUSE AND PREJUDICE BY THE INEFFECTIVE ASSISTANCE OF HIS APPELLATE COUNSEL ON APPEAL AS OF RIGHT.

On July 27, 2006, the trial court denied petitioner's motion for relief from judgment.  The court found that petitioner's double jeopardy claim was barred by Rule 6.508(D)(2) because it had already been decided against petitioner on his direct appeal, and that petitioner's remaining claims were barred by Rule 6.508(D)(3) because petitioner failed to show good cause for his failure to raise the claims on direct appeal.  The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Lee*, 480 Mich. 854, 737 N.W.2d 743 (2007); *People v. Lee*, No. 272315 (Mich. Ct. App. Mar. 30, 2007).

7.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on November 28, 2007.  As grounds for the writ of habeas corpus, he raises the sufficiency of the evidence, confrontation, and sentencing claims that he raised on direct appeal, and the prosecutorial misconduct claim that he raised in his motion for relief from judgment.

8.     Respondent filed his answer on February 5, 2008.  He contends that petitioner's prosecutorial misconduct claim is barred by petitioner's procedural default, and that petitioner's remaining claims are without merit.

B.    *Factual Background Underlying Petitioner's Conviction*

The factual background underlying petitioner's conviction was accurately summarized by

the Michigan Court of Appeals:[2]

> From 1987 through 1998, defendant, his brothers Roderick Lee and Shedrick
> Lee, and other family members and associates, primarily from Pontiac, engaged in
> a long-term, widespread cocaine and heroin trafficking conspiracy in Michigan.
> Defendant and Roderick led and equally controlled the Lee family organization.
> Codefendant Joe Abraham supplied the organization which, in turn, supplied
> numerous individuals for "street" sale or use. Shedrick also allegedly smuggled
> kilograms of cocaine into the state. The lengthy trial included numerous witnesses
> who testified regarding their dealings with the Lee family organization.
>
> Helen Alexander testified that she purchased cocaine from defendant and
> Roderick for several years. In 1987, she allowed defendant to use her house to "cook
> up" and sell drugs, in exchange for drugs and money.[fn1] Two to three times a week
> for four or five months, defendant brought between a quarter to one kilogram of
> cocaine to Alexander's house. Their arrangement ended in 1987 or 1988. Thereafter,
> for a few months in 1989, Alexander bought from two to six ounces of cocaine from
> defendant several times each week, which she sold to a third party. Alexander also
> purchased cocaine from Willie Adams, who was one of defendant's associates, while
> defendant was present. On one occasion, she observed Adams, defendant and other
> individuals seated around a table of four or five kilograms of cocaine. According to
> Alexander, she participated in several drug transactions at various houses owned by
> the Lee brothers.
>
> > [fn1]. Defendant called Mary Willis, the owner of the house, who
> > testified that she never leased or sold her house to Alexander. The
> > prosecution recalled Alexander, who showed pictures of herself at the
> > house. A police witness also testified that, when he arrested Willis'
> > grandson at the house in 1986, Alexander was there.
>
> Ralph McMorris testified that, from the mid-1980's until the mid-1990's he
> bought cocaine from defendant and Roderick in Pontiac. He bought several smaller
> quantities from street sellers, but if he wanted larger quantities, the street sellers went
> to defendant or Roderick. In 1989, he first bought a quarter of a kilogram directly
> from defendant for $8,500. Sometime after February 1994, he again bought a quarter
> of a kilogram directly from defendant. He also once bought three ounces from
> defendant and, on several additional occasions, gave defendant stolen clothing in

---

[2]A more detailed recitation of the evidence adduced at trial is provided at pages 4-20 of
respondent's brief.

exchange for cocaine.

Eric Lee, who is the nephew of defendant and Roderick, began working for Roderick in 1989, and continued selling cocaine and heroin for his uncles until 1996.[fn2] Eric testified that defendant and Roderick led the Lee organization and were equally in control. In 1989, defendant lived with Eric's mother and kept more than a kilogram of cocaine in their apartment. Eric, then fifteen years old, began stealing portions of the cocaine to sell. After Eric's activities were discovered, Roderick began supplying Eric weekly with cocaine to sell. Eric initially began with half-ounce amounts, which eventually grew to over a half kilogram. In 1993 or 1994, Roderick sent Eric to Muskegon to oversee the operation there because there were payment problems. Other Lee relatives were selling drugs for Roderick in Muskegon at the time. Eric remained for two years and was given a quarter to half-kilogram of cocaine on thirty to forty occasions.

> [fn2]. Because Eric was unavailable for trial, his May 2000 preliminary examination testimony was admitted at trial. During the preliminary examination, Eric's grand jury testimony was substantially integrated into the record through the prosecutor's direct examination. At the preliminary examination, Eric Lee claimed that he did not remember his grand jury testimony or its factual basis.

Over the years, Eric observed large quantities of drugs being delivered to defendant and Roderick, every three to four days. Eric believed that the delivery individuals were "running" for Abraham. Shedrick also obtained cocaine for the organization from California and New York. Eric, himself, was supplied with more than 650 grams of cocaine, and observed Roderick sell cocaine to several other people. On one occasion, Eric went to Roderick's apartment and saw him converting two or three kilograms of cocaine into crack. Defendant was also present.

In a statement made to police, Abraham admitted that he received large quantities of cocaine from out of state, which he brokered to different drug organizations, including the Lee brothers and Joseph Steins. Abraham admitted that, on one occasion, he sold twenty kilograms of cocaine to Roderick for $500,000. Antonio James, a drug runner for Joseph Steins, testified that he picked up cocaine from Abraham once or twice a week in quantities of between one and three kilograms for a couple of years. In 1996, James saw a shipment of between twenty and twenty-five kilograms of cocaine delivered to Abraham's house. James testified that, in 1996 or 1997, he heard Abraham brag to Steins that his "Pontiac boys," defendant and Roderick, were selling more drugs than the Steins organization.

LaMark Northern, who began selling drugs in Pontiac in the late 1980s, testified that, on one occasion, he, Roderick, and DeMar Garvin went to Abraham's house and purchased between eight and ten kilograms of cocaine for $200,000. In discussing the intended allocation of the cocaine, Garvin indicated that he was to receive one kilogram, defendant was to receive two kilograms, Northern was to receive less than one kilogram, and Adams was to receive more than one kilogram.

Northern testified that he first received cocaine from Roderick in 1987 or 1988. In 1988 or 1989, he bought a half-kilogram of cocaine from Roderick for $14,500. Northern routinely received cocaine from Roderick, which he, in turn, often broke down into smaller quantities and sold. Northern testified that, on one occasion when he was having financial problems, defendant refused his request to "front" him a quarter of a kilogram of cocaine, indicating that he would work with him if he "could come up with some money." Northern purchased more than 650 grams of cocaine from Roderick or Garvin, who also purchased his cocaine from Roderick and others. In the mid-1990s, Northern was receiving cocaine and heroin from Garvin and Roderick every two to three days, which he broke down and sold in the Pontiac area. Roderick or Garvin supplied Northern until he was arrested in March 1996.

Northern testified that he twice received cocaine from Larry McGee, who had also sold cocaine to defendant. Northern testified that, in 1994, he overheard a conversation between Garvin and McGee, who was upset with defendant because he surcharged him for a cocaine delivery. McGee stated that, when he served as a middleman and delivered cocaine to defendant, he did not surcharge him.[fn3] According to Northern, in 1997, Menion Stimage indicated that Roderick was supplying him. Also, one of Northern's family members, Jermaine Cohen, was receiving cocaine from Johnnie Stanley, who was being supplied by Roderick.

> [fn3]. In September 1998, police executed a search warrant at McGee's house and confiscated, inter alia, a digital scale, drug tally sheets, more than four hundred grams of cocaine, and nearly five grams of heroin.

In September 1994, the Pontiac police executed a search warrant at a suspected drug house, and confiscated cocaine and various drug-weighing and packaging materials. While there, Adams called and, in response to an officer's request to buy cocaine, said that he could obtain two ounces from "Big Nate's" house. The police were aware that "Big Nate" referred to defendant. After receiving directions to defendant's house from Adams, the police secured the house and obtained a search warrant. During the execution of the warrant, some individuals fled from the police. Although defendant was not present, various items of identification and receipts belonging to him were found inside one of the bedrooms. Inside the house, police found numerous weapons and ammunition, a large amount of money, a digital scale, and more than 116 grams of cocaine. There was no clothing, food, or toiletries in the home.

Eric Lee testified before the grand jury that, on the day of the execution of the warrant, he was recently at the house but had been sent to the store to purchase beer. Eric testified that, when he left, defendant and others were sitting around gambling, and drugs and several guns were in the house. When he returned, the police were searching the house. Two individuals told him that defendant "was all right" and had escaped through a window.

In October 1994, Pennsylvania police stopped a car for erratic driving. The

driver, Shedrick, falsely identified himself as "Nathaniel Lee" and produced an application for a driver's license in defendant's name. A subsequent search of the vehicle revealed nearly three kilograms of cocaine and more than six grams of heroin hidden in a secret compartment underneath the vehicle. A drug enforcement special agent opined that, based on Shedrick's explanation of the transaction, Shedrick was a courier for a larger drug organization, and had a previous relationship with his out-of-state source.

In July 1998, Shedrick had shared a jail cell with Ricky Buchanan for nearly a year. According to Buchanan, Shedrick told him that he was being charged with additional drug-related crimes that had continued after he was jailed in federal prison for bringing cocaine to Michigan. Shedrick told Buchanan that he was in the drug business with his brothers, defendant and Roderick, and that, even after being incarcerated, he "still had his part in the business ... because he paid his dues." Shedrick indicated that he was supposed to receive approximately a million dollars because defendant and Roderick had a fifteen-kilogram shipment being delivered to Michigan from out of state. Buchanan indicated that Shedrick offered him a job as a driver when he "got out," because he had seen Buchanan's police chase on the television show, "Cops." According to Buchanan, Shedrick was very upset with his nephew, Eric, and said that he "wanted him dead" before he could testify against him.

In September 1998, search warrants were executed for ten homes in the Pontiac area connected to the Lee family organization. At one of the homes, police found numerous letters to defendant, ammunition, a weapon, a medicine bottle bearing defendant's name, a digital scale, and a cell phone. One letter written to defendant stated, "I must be a d* * * fool to have honestly thought you was [sic] down with me and not the product." The letter also referred to doing business with defendant, and contained the terms, "candy" and "kibbles and bits," which are common names for cocaine.

Numerous individuals purportedly involved in the Lee family organization, including defendant, were arrested. Defendant was not employed during the duration of the drug trafficking conspiracy, and he did not file any tax returns from 1987 though 1998.

*Lee*, 2004 WL 2877319, at *1-*4, slip op. at 1-4.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

10

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Sufficiency of the Evidence (Claim I)*

Petitioner first contends that the prosecution presented insufficient evidence to convict him of conspiracy to deliver or possess with intent to deliver 650 grams or more of cocaine.  The Court

should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case."  *Patterson v. New York*, 432 U.S. 197,

211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Michigan law prohibits possession with intent to deliver cocaine, with the crimes and associated penalties categorized by weight involved. As it existed at the time of petitioner's conduct, the Michigan statute provided: "Except as authorized by this article, a person shall not manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance, a prescription form, or a counterfeit prescription form." MICH. COMP. LAWS § 333.7401(1).[3] The statute further provided for penalties based on the amount of drugs involved: for 650 grams or more, 20 years' to life imprisonment; for 225 to not more than 650 grams, 20-30 years' imprisonment; for 50 grams to not more than 225 grams, 10-20 years' imprisonment; and for less than 50 grams, 1-20 years' imprisonment. *See id*. § 333.7401(2). Further, under Michigan law any person who conspires with one or more other persons to commit an offense prohibited by law is guilty of the crime of conspiracy, and, in the case of felonies, is punished to the extent he would be punished if found guilty of the underlying substantive offense. *See* MICH. COMP. LAWS § 750.157a(a). Under Michigan law,

> [c]riminal conspiracy is a mutual understanding or agreement between two or more persons, expressed or implied, to do or accomplish some criminal or unlawful act.
> The gist of the offense lies in the unlawful agreement between two or more persons to do the unlawful act. All the requisite elements of the crime of conspiracy are met when the parties enter into the mutual agreement, and no overt acts necessarily must be established.

---

[3]All citations to § 333.7401 are to the statute as it existed prior to its amendment by 2002 Mich. Pub. Acts 665 (Mar. 1, 2003), as set forth in the historical notes to the current statutory provision. The 2003 amendment changes the amounts triggering the various statutory penalties, as well as the penalties themselves.

*People v. Hamp*, 110 Mich. App. 92, 102, 312 N.W.2d 175, 180 (1981) (citations omitted); *see also*, *People v. Buck*, 197 Mich. App. 404, 412, 496 N.W.2d 321, 327 (1992), *rev'd in part on other grounds sub nom. People v. Holcomb*, 444 Mich. 853, 508 N.W.2d 502 (1993).

Thus, "[t]o be convicted of conspiracy to possess with intent to deliver a controlled substance, the people must prove that (1) the defendant possessed the specific intent to deliver the statutory minimum as charged, (2) his coconspirators possessed the specific intent to deliver the statutory minimum as charged, and (3) the defendant and his coconspirators possessed the specific intent to combine to deliver the statutory minimum as charged to a third person." *People v. Justice*, 454 Mich. 334, 349, 562 N.W.2d 652, 659 (1997).  However, "direct proof of the conspiracy is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties. Inferences may be made because such evidence sheds light on the coconspirators' intentions." *Id*. at 347, 562 N.W.2d at 659 (citation omitted); *see also*, *Cameron v. Birkett*, 348 F. Supp. 2d 825, 839 (E.D. Mich. 2004) (Gadola, J., adopting Report of Komives, M.J.); *People v. Cotton*, 191 Mich. App. 377, 393, 478 N.W.2d 681, 688 (1991);.  "'A two-fold specific intent is required for conviction: intent to combine with others, and intent to accomplish the illegal objective.'" *Cameron*, 348 F. Supp. 2d at 839 (quoting *People v. Carter*, 415 Mich. 558, 568, 330 N.W.2d 314, 319 (1982)).

2.    *Analysis*

Petitioner contends that although there may have been some evidence presented that he engaged in substantive acts of possessing or delivering controlled substances, the prosecution's evidence failed to establish the existence of any specific intent on his part to enter into an agreement with the coconspirators to deliver or possess with intent to deliver cocaine.  The Michigan Court of

Appeals rejected this claim, reasoning:

> The evidence indicated that defendant, as a co-leader of the Lee family organization, knowingly cooperated with others to further a drug trafficking scheme to possess and deliver multiple kilograms of cocaine. There was testimony that defendant and his brother, Roderick, led and equally controlled the Lee family organization. Testimony revealed that, as early as 1987, defendant used the house of a friend, Alexander, to "cook up" and sell a quarter to a kilogram of cocaine each week for four or five months. There was also evidence that defendant and Roderick received numerous kilograms of cocaine from Abraham, an admitted drug supplier, and disbursed them to numerous individuals for sale or use. Defendant's nephew, Eric, routinely saw Abraham's "runners" delivering large quantities of cocaine to defendant and Roderick every three to four days. On one occasion, Abraham sold eight to ten kilograms of cocaine to Roderick for $200,000, two of which were earmarked for defendant. Abraham stated that the Lee organization, specifically referring to defendant and Roderick, sold more cocaine than another drug organization, which obtained one to two kilograms a week for years. Alexander observed defendant seated around a table of four to five kilograms of cocaine. A jury could reasonably infer from this evidence that defendant did not intend to personally use these vast amounts of cocaine, but intended to distribute them to third parties.
>      . . . .   Viewed in a light most favorable to the prosecution, the evidence presented in this case reflected a long-term conspiracy to traffic drugs and was sufficient to sustain defendant's conviction for conspiracy to deliver or possess with intent to deliver 650 grams or more of a controlled substance.

*Lee II*, 2004 WL 2877319, at *4-*5, slip op. at 5.  The Court should conclude that this determination was reasonable.

The prosecution presented significant evidence that petitioner himself was involved in a large-scale drug operation with others, most notably his brother Roderick Lee.  A number of witnesses testified to a large scale drug operation involving petitioner and his brother, or to individual transactions involving members of this operation.  Petitioner does not dispute that there was significant evidence of such a large scale drug distribution operation, but only whether there was any evidence to tie him to this operation.  With respect to petitioner in particular, Ricky Buchanan testified as to statements made by petitioner's other brother, Shedrick Lee, which indicate that he, petitioner, and Roderick Lee distributed drugs together.  *See* Trial Tr., dated 10/8/02, at 150,

15

158-59, 161.  Helen Alexander testified that she purchased drugs from petitioner, that petitioner distributed drugs, and that she allowed petitioner to "cook" drugs in her home.  *See id.* at 176-90. Ralph McMorris testified that he bought drugs from petitioner or people working with petitioner on numerous occasions.  When he wanted to purchase large quantities which petitioner's couriers could not personally supply, he would go with the couriers to petitioner's home to obtain the drugs.  *See id.*, dated 10/9/02, at 33-45.  Police raided a home owned by Terrance Vaughn, and while conducting a search of the home received a call from Willie Adams.  The officer answering the phone posed as a buyer, and asked to purchase an ounce of cocaine.  Adams replied that he could pick it up at "Big Nate's" house and gave directions to the house.  *See id.*, dated 9/24/02, at 103-06, 110-11.  The police subsequently obtained a search warrant for the home, and the police search uncovered drugs, a number of weapons, currency, and a digital scale.  There was no evidence that someone was living in the home, such as food, clothing, or toiletries.  When the police raided the home, a number of people fled.  Although the deed to the home was in the name of Roderick Lee, the police found identification and receipts in petitioner's name.  *See id.*, at 148-77; *id.*, dated 10/1/02, at 214-33.  A search of another home, also in Roderick Lee's name, uncovered guns, a digital scale, a pill bottle with petitioner's name on it, and correspondence addressed to petitioner, including a letter specifically referencing petitioner's role in drug dealing.  *See id.*, dated 10/11/02, at 13-14, 52-53, 57, 91, 109-10.

This evidence provided more than sufficient basis for the jury to conclude, beyond a reasonable doubt, that petitioner conspired to deliver or to possess with intent to deliver over 650 grams of cocaine.  The evidence demonstrates a large, established drug distribution network and petitioner's role in that network.  Although there is no direct evidence of an agreement between

16

petitioner and any individual coconspirator, such an agreement can reasonably be inferred from petitioner's extensive role in drug distribution and his relationships, both familial and financial, with the other participants in the conspiracy.  This evidence was sufficient to prove petitioner's guilt beyond a reasonable doubt. *See United States v. McCullough*, 457 F.3d 1150, 1160 (10th Cir. 2006); *United States v. Castro*, 15 F.3d 417, 419-20 (5th Cir. 1994); *cf. United States v. Stallings*, 194 Fed. Appx. 827, 832 (11th Cir. 2006) (evidence sufficient to establish a single conspiracy, rather than multiple conspiracies, where evidence showed substantial overlap between the participants connected to the common goal of the conspiracy).[4]

Petitioner also contends that the evidence was insufficient because the witnesses against him were not credible and had a motive to lie to curry favor with the police and prosecutor.  However, it is well-established that a reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence."  *United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.2d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). Further, the fact that the evidence may have supported another version of events–that petitioner

---

[4]In addition to this evidence Eric Lee, in his preliminary examination testimony which was read into the record at trial, provided substantial other evidence to support petitioner's conspiracy conviction. Petitioner contends that Eric Lee's preliminary examination testimony was improperly admitted at trial. While the erroneous admission of evidence may, or may not, entitle a habeas petitioner or appellant to relief on that basis, in assessing the sufficiency of the evidence the Court is required to weigh all of the evidence, even that evidence which was improperly admitted. *See United States v. Carneglia*, 47 Fed. Appx. 27, 34-35 (2d Cir. 2002); *United States v. Castaneda*, 16 F.3d 1504, 1510 (9th Cir. 1994); *cf. Lockhart v. Nelson*, 488 U.S. 33, 38-39 (1988) (in assessing whether the evidence was sufficient for purposes of determining whether retrial is permitted under the Double Jeopardy Clause, court looks at all of the evidence admitted, even that which was improperly admitted).  Nevertheless, because it bears on the resolution of petitioner's confrontation claim, discussed below, I do not consider Eric Lee's testimony in assessing the sufficiency of the evidence against petitioner.

merely dealt drugs on his own without being part of a larger conspiracy–is irrelevant; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient.  *See Jackson*, 443 U.S. at 326.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Confrontation (Claim II)*

Petitioner next contends that he was denied his Sixth Amendment right to confront the witnesses against him by the introduction of Eric Lee's preliminary examination testimony at trial. Petitioner argues that Eric Lee was not "unavailable" as a witness of trial because Eric Lee's assertion of his Fifth Amendment privilege was not credible in light of the substantial self-incriminating testimony Eric Lee had already given to the grand jury and at the preliminary examination.  Petitioner also contends that he did not have a prior opportunity to cross-examine Eric Lee because, even if Eric Lee was subject to cross-examination at the preliminary examination, at the preliminary examination the prosecutor read into the record Eric Lee's testimony before the grand jury, which was not subject to cross-examination.  This portion of Eric Lee's testimony was also read into the record at trial.  Regardless of the merit of petitioner's argument on the confrontation question, the Court should conclude that petitioner is not entitled to habeas relief on this claim because any error in the admission of Eric Lee's testimony was harmless.

In *Chapman v. California*, 386 U.S. 14 (1967), the Supreme Court ruled that where a court finds a constitutional error on direct review, a conviction may stand only if the error is harmless beyond a reasonable doubt.  *See id*. at 24.  However, in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Court held that a federal habeas court does not apply the *Chapman* harmless error analysis–which asks whether the error was harmless beyond a reasonable doubt–but rather the

18

harmless error analysis announced in *Kotteakos v. United States*, 328 U.S. 750, 776 (1946), which asks whether the error had a substantial and injurious effect on the jury's verdict.  *See Brecht*, 507 U.S. at 635-37.  Following the enactment of the AEDPA, the courts issued conflicting decisions on how federal habeas courts should conduct harmless error review in light of whether the state court reviewed an error for harmlessness.  However, the Supreme Court has now clarified that, regardless of whether or not a state court conducted harmless error review, a federal habeas court must always apply the *Brecht* harmless error standard.

In *Fry v. Pliler*, 551 U.S. 112 (2007), the Court explained that *Brecht* established a categorical rule regarding the collateral review harmless-error inquiry, and that nothing in the AEDPA alters this categorical rule.  Rejecting the petitioner's argument that a state harmless-error analysis should be analyzed by asking whether the state court reasonably applied *Chapman*, the Court explained:

> Petitioner contends that, even if *Brecht* adopted a categorical rule, post-Brecht developments require a different standard of review. Three years after we decided *Brecht*, Congress passed, and the President signed, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), under which a habeas petition may not be granted unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ...." 28 U.S.C. § 2254(d)(1). In *Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (per curiam), we held that, when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable. Petitioner contends that § 2254(d)(1), as interpreted in *Esparza*, eliminates the requirement that a petitioner also satisfy Brecht's standard. We think not. That conclusion is not suggested by *Esparza*, which had no reason to decide the point. Nor is it suggested by the text of AEDPA, which sets forth a precondition to the grant of habeas relief ("a writ of habeas corpus ... shall not be granted" unless the conditions of § 2254(d) are met), not an entitlement to it. Given our frequent recognition that AEDPA limited rather than expanded the availability of habeas relief, *see, e.g., Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), it is implausible that, without saying so, AEDPA replaced the *Brecht* standard of " 'actual prejudice,' "

507 U.S., at 637, 113 S.Ct. 1710 (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)), with the more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable. That said, it certainly makes no sense to require formal application of both tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former.

*Fry*, 551 U.S. at 119-20. Thus, the Court held that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the [*Brecht* standard] whether or not the state appellate court recognized the error and reviewed it for harmlessness under the [*Chapman* standard]." *Fry*, 551 U.S. at 121-22. Thus, the Court here is concerned only with whether the admission of Hare's testimony was harmless under the *Brecht* standard. *See Ruelas v. Wolfenbarger*, 580 F.3d 403, 411-13 (6th Cir. 2009); *Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007).

In *Brecht*, the Supreme Court ruled that trial error does not entitle a state prisoner to habeas relief unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776 (1946)). Further, the Supreme Court has more recently instructed that a federal habeas court need not be certain that the error had a substantial and injurious effect on the verdict; rather, "when a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (quoting *Brecht*, 507 U.S. at 637).[5] As the *Kotteakos* Court noted, whether an error was harmless is necessarily a context-specific determination. *Kotteakos*, 328 U.S. at 762. Confrontation Clause violations are subject

---

[5]A "grave doubt" exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal*, 513 U.S. at 435.

to harmless error analysis. *See Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999).

Here, as explained in connection with petitioner's sufficiency of the evidence claim, there was substantial other evidence presented relating to petitioner's role and participation in the conspiracy. A number of witnesses testified to petitioner's drug distribution activities, and direct testimony tied him to a conspiracy consisting of drug couriers and sellers acting in concert with petitioner. Further, additional circumstantial evidence tied petitioner to the drug distribution network headed by Roderick Lee, including identification and personal correspondence of petitioner found in homes containing evidence of drug dealing which were deeded in Roderick Lee's name, as well as statements made by Shedrick Lee to his cell mate. In light of the substantial evidence of petitioner's guilt apart from the testimony of Eric Lee, the introduction of Eric Lee's preliminary examination testimony did not have a substantial and injurious effect on the verdict. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Sentencing (Claim III)*

Petitioner next raises a number of challenges to his sentence. Specifically, petitioner contends that the trial judge erred by failing to: (1) properly consider the established sentencing factors; (2) consider the presentence report; and (3) individualize his sentence. Petitioner also contends that his sentence is disproportionate to his offense. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Failure to Consider Sentencing Factors/Presentence Report or Individualize Sentence*

Petitioner's claims that the trial court failed to consider the established sentencing factors or presentence report, and failed to individualize his sentence, do not state cognizable claims for

habeas relief.

A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).    Petitioner's argument that the trial judge focused solely on punishment, and did not give any weight to other recognized sentencing factors such as his potential for rehabilitation, does not provide a basis for habeas relief. As petitioner suggests, there are four generally recognized purposes of criminal sanctions, and imprisonment in particular: rehabilitation, deterrence, incapacitation, and retribution (*i.e.*, punishment). *See generally*, *United States v. Brown*, 381 U.S. 437, 458 (1965); *Trop v. Dulles*, 356 U.S. 86, 111 (1958) (Brennan, J., concurring); Toni M. Massaro, *Shame, Culture, and American Criminal Law*, 89 MICH. L. REV. 1880, 1890 (1991). However, nothing in the Constitution requires a state to establish its system of criminal sanctions to give primacy to any one of these goals. *See Harmelin*, 501 U.S. at 999 (Kennedy, J.) ("[T]he Eighth Amendment does not mandate adoption of any one penological theory."). Thus, so long as the imprisonment is not cruel and unusual under the Eighth Amendment and does not violate some other constitutional guarantee such as the Equal Protection Clause, a state is free to impose imprisonment solely for the purpose of punishment. *Cf. Furman v. Georgia*, 408 U.S. 238, 308 (1972) (Stewart, J., concurring) ("The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a

22

society governed by law.").

Similarly, nothing in the federal Constitution requires a court to consider or even prepare a presentence report.  To the extent that a report was required in petitioner's case, it was required only as a matter of state law; "there is no federal constitutional right to a presentence investigation and report."  *Elswick v. Holland*, 623 F. Supp. 498, 502 (S.D. W. Va. 1985); *accord Lawson v. Riddle*, 401 F. Supp. 410, 412 (W.D. Va. 1975); *cf.* FED. R. CRIM. P. 32(b)(1)(A) (presentence report not required where the information in the record enables the court to exercise its sentencing authority in a meaningful manner).  Thus, the trial court's alleged failure to consider the presentence report does not provide a basis for habeas relief.

Likewise, petitioner's claim that the trial court failed to impose an individualized sentence does not state a constitutional claim cognizable on habeas review.  Although the Supreme Court has held that individualized sentencing is required in the death penalty context, *see, e.g.*, *Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), these cases "have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties."  *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 110-112 (1982); *Rummel v. Estelle*, 445 U.S. 263, 272 (1980); *Lockett v. Ohio*, 438 U.S. 586, 602-05 (1978); *Woodson*, 428 U.S. at 303-05).  Based on these cases, the *Harmelin* Court explicitly declined to extend the individualized sentencing requirement to non-capital cases.  *Harmelin*, 501 U.S. at 996 ("We have drawn the line or required individualized sentencing at capital cases, and see no basis for extending it further."); *see also*, *id.* at 1006 (Kennedy, J., concurring).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these

23

claims.

      2.     *Proportionality*

Petitioner next argues that his sentence is disproportionate to his offense. To the extent that petitioner relies on the Michigan proportionality rule established in *People v. Milbourn*, 435 Mich. 630, 461 N.W.2d 1 (1990), his claim is solely one of state law which is not cognizable on federal habeas review. *See Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.). To the extent petitioner claims that his sentence violates the Eighth Amendment, the claim is without merit.

In *Solem v. Helm*, 463 U.S. 277 (1983), the Supreme Court held that the Eighth Amendment requires that "a criminal sentence be proportionate to the crime for which the defendant has been convicted." *Id.* at 290. In considering whether a sentence is proportionate, the Court identified three objective factors which are relevant: "(I) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for the same crime in other jurisdictions." *Id*. at 292. Applying this test to the facts before it, the Court found that the defendant's sentence of life imprisonment without possibility of parole under a habitual offender statute was disproportionate where the three underlying felonies were nonviolent crimes involving small sums of money, the final felony being for uttering a false check. *See id.* at 303.

However, the reach of *Solem* has been limited by the Supreme Court's more recent decisions. In *Harmelin v. Michigan*, 501 U.S. 957 (1991), the Court held that Michigan's mandatory sentence of life imprisonment for possession of over 650 grams of a controlled substance did not violate the Eighth Amendment. Justice Scalia, joined by Chief Justice Rehnquist, reasoned that *Solem* was

24

wrongly decided and should be overruled, and concluded that the Eighth Amendment contains no proportionality requirement outside the capital punishment context. *See Harmelin*, 501 U.S. at 965 (Scalia, J.). Justice Kennedy, joined by Justices O'Connor and Souter, concluded that the Eighth Amendment contains a very narrow proportionality principle, which prohibits only those punishments which are 'grossly' disproportionate to the crime. *See id*. at 1001 (Kennedy, J.). Further, Justice Kennedy's opinion distinguished *Solem*, essentially limiting application of the *Solem* objective criteria test to the facts in that case. *See id.* at 1001-05. Specifically, Justice Kennedy concluded that the objective analysis required in *Solem* is "appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id*. at 1005-06.[6] Thus, it is unclear whether, and to what extent, *Solem* remains good law. *See McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992) ("By applying a head-count analysis, we find that seven members of the Court supported a continued Eighth Amendment guaranty against disproportional sentences. Only four justices, however, supported the continued application of all three factors in *Solem*, and five justices rejected it. Thus, this much is clear: disproportionality survives; *Solem* does not.").

As the Sixth Circuit has summarized, under *Harmelin*, "although only two Justices [Rehnquist and Scalia] would have held that the eighth amendment has no proportionality requirement, five Justices [Kennedy, O'Connor, and Souter, along with Rehnquist and Scalia] agree that there is no requirement of strict proportionality." *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991). At most, then, the Eighth Amendment "forbids only extreme sentences that are

---

[6] Justices White, Blackmun, Stevens, and Marshall all concluded that *Solem* should be upheld, and the three factor test applied to the sentencing scheme at issue. *See Harmelin*, 501 U.S. at 1016 (White, J., dissenting).

'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001; *Hopper*, 941 F.2d at 422 ("the eighth amendment is offended only by an extreme disparity between crime and sentence").  Thus, as a general matter, "one could argue without fear of contradiction by any decision of the [Supreme] Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of sentence actually imposed is purely a matter of legislative prerogative."  *Rummel v. Estelle*, 445 U.S. 263, 274 (1980); *see Harmelin*, 501 U.S. at 962-65 (Scalia, J.); *id.* at 997-1001 (Kennedy, J.)

More recently, the Supreme Court again considered the proportionality issue under the Eighth Amendment, resulting in a split similar to that reached in *Harmelin*. In *Ewing v. California*, 538 U.S. 11 (2003), a three-justice plurality reaffirmed Justice Kennedy's approach in *Harmelin*, concluding that the Eighth Amendment contains a narrow proportionality principle which forbids sentences which are grossly disproportionate to the offense. *See id.* at 23-24 (opinion of O'Connor, J.) Justice O'Connor was joined in this position by Justice Kennedy, who had authored the plurality opinion in *Harmelin*, and by Chief Justice Rehnquist, who in *Harmelin* had joined Justice Scalia in concluding that the Eighth Amendment contains no proportionality requirement outside of the capital sentencing context. Justice Scalia, now joined by Justice Thomas (who was not on the Court when *Harmelin* was decided), reaffirmed his view that the Eighth Amendment contains no proportionality guaranty. *See id.* at 32 (opinion of Scalia, J.); *id.* at 32 (opinion of Thomas, J.). Justice Stevens likewise reaffirmed his view from *Harmelin* that the three-factor test of *Solem* guides the proportionality inquiry under the Eighth Amendment. Justice Stevens was joined in this view by Justice Souter, who had joined the plurality opinion of Justice Kennedy in *Harmelin*, as well as by Justices Ginsburg and Breyer, who were not on the Court when *Harmelin* was decided. *See id.*

at 33-35 (opinion of Stevens, J.); *id.* at 36-37 (opinion of Breyer, J.). Thus, although the particular Justices attached to each position have changed somewhat, the numbers and rationales in *Ewing* break down precisely as they did in *Harmelin*. Thus, for purposes of habeas review, the Sixth Circuit's analysis of *Harmelin*, in which this Court asks only whether the sentence is grossly disproportionate to the offense, *see Coleman v. DeWitt*, 282 F.3d 908, 915 (6th Cir. 2002); *United States v. Baker*, 197 F.3d 211, 217 (6th Cir. 1999), remains controlling under *Ewing*.

Here, the *Harmelin* plurality's "threshold comparison" of petitioner's crime and the sentence imposed, does not "lead to an inference of gross disproportionality," *Harmelin*, 501 U.S. at 1005, and thus the Court should conclude that petitioner is not entitled to habeas relief on this ground. In *Harmelin*, the Court upheld the mandatory term of nonparolable life imprisonment imposed by MICH. COMP. LAWS § 333.7403(2)(a)(I) prior to its 1998 amendment. Specifically, a majority of the Court found that the sentence did not violate the principle of proportionality, if any, imposed by the Eighth Amendment. *See Harmelin*, 501 U.S. at 990 (Scalia, J., joined by Rehnquist, C.J.) (concluding that Eighth Amendment contains no proportionality requirement outside the capital punishment context); *id.* at 1005 (Kennedy, J., joined by O'Connor and Souter, JJ.) (concluding that Michigan's sentencing scheme does not violate the narrow proportionality required by the Eighth Amendment). It follows that petitioner's lesser sentence of 30-60 years' imprisonment for conspiracy to commit the same offense as involved in *Harmelin* is therefore constitutional. *See also*, *Hutto v. Davis*, 454 U.S. 370 (1982) (per curiam) (40 year prison term and $20,000 fine imposed for possession and distribution of nine ounces of marijuana not unconstitutional); *United States v. Valdez*, 16 F.3d 1324, 1334 (2d Cir. 1995) (upholding life without parole for "merely middle-level drug dealers"). Accordingly, the Court should conclude that petitioner is not entitled

27

to habeas relief on this claim.

G.    *Prosecutorial Misconduct (Claim IV)*

Finally, petitioner contends that he was denied a fair trial by the prosecutor's improper comments during closing argument. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

2.    *Analysis*

Petitioner contends that the prosecutor misstated the law and shifted the burden of proof

when she stated, during closing argument:

> Ladies and gentlemen, this is what a conspiracy is.  Did he agree with one or more persons, sometime in 1985 and 1998, to deliver over 650 grams of cocaine?  Undisputably he did.  And what you've also heard is that he had to be – the Judge is going to tell you about a membership.  The Defendant doesn't have to know Johnny Stanley, he doesn't have to know Louis Laws, he doesn't ever have to have spoken with him.  He doesn't have to know if they are even alive.

Trial Tr., dated 10/16/02, at 20.  This argument, however, did not misstate the law of conspiracy.

Under Michigan conspiracy law, it is well established that to prove conspiracy it is "unnecessary to show that the defendant knew the full scope of the conspiracy or participated in carrying out each detail. Nor need he be acquainted with each of his alleged coconspirators or know the exact part played by each of them." *People v. Newsome*, 3 Mich. App. 541, 553, 143 N.W.2d 165, 170 (1966); *accord People v. Grant*, 455 Mich. 221, 236 n.20, 565 N.W.2d 389, 397 n.20 (1997).  This is precisely the argument the prosecutor was making, as evidenced by the comments made by the prosecutor in the passage immediately following the one identified by petitioner:

> The fact that Nathaniel Lee sits at the table with Johnny Stanley and Louis Laws should mean absolutely nothing to you.  And your job is to judge the guilt of Nathaniel Lee.  And, in fact, you heard very little evidence, if any, that Nathaniel Lee dealt with Louis Laws or Johnny Stanley individually.
> And when the Judge read the indictment at the beginning, he gave you a ton of names.  I think there was eight or nine names that he listed and he also said, in addition to those eight or nine names, you can consider whether or not Nathaniel Lee agreed with others unnamed.  So it doesn't have to be one of the named individuals.  And you will not hear from the Judge that Nathaniel Lee had to agree with Louis Laws.  You will not hear from the Judge that Nathaniel Lee had to agree with Johnny Stanley.  You will not hear that he had to agree with Roderick Lee or Shedrick Lee.  You will hear from him that he had to agree with one other person or more.

Trial Tr., dated 10/16/02, at 20-21.  Thus, the prosecutor was merely arguing that the jury could find petitioner guilty as long as he agreed with one other person, regardless of whether he agreed with Roderick Lee, Shedrick Lee, or his two codefendants (Johnny Stanley and Louis Laws).  Because

29

a conspirator need not know the full scope or extent of the conspiracy or all of the participants in the conspiracy, this argument was a correct statement of the law.

Further, even if the prosecutor's argument were an incorrect statement of the law, petitioner cannot show that he was prejudiced by the prosecutor's argument.  The trial court instructed the jury that the comments and arguments of counsel are not evidence, and that the jury should only follow the court's instructions on the law and should disregard any statements on the law which conflicted with the court's instructions.  *See* Trial Tr., dated 10/16/02, at 60, 62.  The court also gave an extensive and proper instruction on the law of conspiracy.  *See id*. at 71-75.  Because the trial court correctly stated the law and admonished the jury that only its instructions on the law were to be followed, petitioner cannot show that he was prejudiced by the prosecutor's alleged misstatement of the law.  *See United States v. Wadlington*, 233 F.3d 1067, 1079 (8th Cir. 2000); *United States v. Gonzalez-Gonzalez*, 136 F.3d 6, 9 (1st Cir. 1998).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this prosecutorial misconduct claim.

H.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a

30

certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either

31

grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also deny a certificate of appealability for the reasons set forth above. Given the voluminous evidence against petitioner, the resolution of petitioner's sufficiency of the evidence claim is not debatable among reasonable jurists. Likewise, the overwhelming evidence clearly establishes that the admission of Eric Lee's preliminary examination testimony did not have a substantial and injurious effect on the jury's verdict, and thus the resolution of petitioner's confrontation claim is not reasonably debatable. Petitioner's sentencing claims are, for the most part, state law claims not cognizable on habeas review, and thus the resolution of these claims is not reasonably debatable. With respect to petitioner's proportionality claim, the Supreme Court's acceptance of a life sentence for a similar crime in *Harmelin* makes it not reasonably debatable that petitioner's lesser sentence of 30-60 years' imprisonment does not violate the Eighth Amendment. Finally, a review of the transcript and Michigan conspiracy law makes it clear that the prosecutor's closing argument neither misstated the law nor shifted the burden of proof, rendering the resolution of petitioner's prosecutorial misconduct claim not reasonably debatable. Accordingly, if the Court accepts my recommendation regarding petitioner's habeas application, the Court should also deny a certificate of appealability.

I.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an

32

unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated: 12/14/09

33

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on December 14, 2009.

s/Eddrey Butts
Case Manager